ORFINGER, R. B., J.,
dissents.
I respectfully dissent. In my view, the majority’s analysis is flawed in that it assumes, without proof, that the public service tax was paid on all of the over-earnings refunded to BellSouth’s Orange County customers. That assumption not only lacks record support, but also fails to take into account the regulatory scheme to which BellSouth is subject.
BellSouth provides local telephone service to residents of Orange County. Under Florida law, BellSouth is required to collect and remit to Orange County a seven percent “public service” tax on “the total amount charged” for “each purchase of telecommunication service” within the county.[1] Orange County, Fla., Code 17-236(c); § 166.231(9), Fla. Stat. (1999).[2] As a Florida provider of telecommunication service, BellSouth is subject to regulation by the Florida Public Service Commission *479 (“PSC”). See § 364.01, Fla. Stat. (1999). The PSC sets BellSouth’s rates for certain services and is authorized to limit its earnings to a “reasonable rate of return.” §§ 364.035, 364.05, 364.051, Fla. Stat. (1999).
Significant to an understanding of the issues presented by this case is that only certain of BellSouth’s revenues, primarily those coming from local telephone service, are subject to Orange County’s public service tax, while other BellSouth services are not taxed. However, all of BellSouth’s earnings, whether subject to Orange County’s tax or not, are included if the PSC orders an over-earnings refund, as it did in this case.
In 1992, as part of its regulatory oversight, the PSC initiated a review of Bell-South’s earnings. The Office of Public Counsel (“OPC”) intervened, and ultimately, BellSouth and OPC entered into a settlement agreement, the terms of which were incorporated into three separate PSC orders. Those orders required BellSouth to refund approximately $210 million in excess earnings to its Florida customers, including those in Orange County. Pursuant to the PSC orders, BellSouth refunded: (1) $ 50.1 million in June, 1997; (2) $ 123 million together with interest in June, 1998; and (3) $ 38 million in December, 1998.
As required by rule 25-4.114, Florida Administrative Code, the refunds were made based on “access lines, pro rata according to rate level.”[3] In the three relevant months, BellSouth applied the refunds as a credit on its customers’ bills and assessed the public service tax on the remaining balance. Realizing that the public service tax remitted in those months was substantially less than the amounts normally remitted by BellSouth, Martha Hay-nie, the Comptroller of Orange County, issued a determination that BellSouth should have applied the public service tax to the gross amount of BellSouth’s customers’ bills before the application of the over-earnings refund, and concluded that the public service tax on the refunded sums remained due. As a result, the Comptroller assessed BellSouth for the tax amounts credited to the customers’ bills in June, 1997, June, 1998, and December, 1998.
BellSouth disagreed with the Comptroller’s assessments and utilized the protest and appeal procedure available to contest the assessments. After the Comptroller denied the protest, BellSouth instituted two separate actions against the Comptroller and Orange County for declaratory relief, challenging the assessments of the public service tax. In its lawsuits, Bell-South asked the circuit court to declare the assessments void and unenforceable, and award BellSouth costs and attorney’s fees pursuant to Orange County Ordinance 91-17 (1991), and section 57.105, Florida Statutes (1999). Orange County counterclaimed for the taxes it claimed were owed, demanding a total amount of $654,921.69, plus interest. Orange County also sought attorney’s fees and costs under Orange County Ordinances 91-17 and 98-33, and section 57.105. The two actions were consolidated for disposition in the trial court and on appeal.
*480 All of the parties filed motions for summary judgment. At the summary judgment hearing, the court narrowed the issue to the question of “whether BellSouth should have calculated the tax to the customer on the total amount of the access charge for that month, or whether it should have calculated, as it did, on the amount the customer had to pay after receiving the credit.” The trial court entered a summary final judgment in favor of BellSouth, and against Orange County and the Comptroller. In pertinent part, the trial court concluded:
The facts giving rise to this controversy are relatively straightforward. Under Florida Statutes § 166.231(9)[,] a local government may levy a tax— known as a “public service tax” — on the purchase of telecommunication services. The tax is imposed directly on the customers of such services and is collected for the benefit of the local government by the seller thereof — in this case BELLSOUTH. To this extent the tax is analogous to a sales tax.
Pursuant to its exclusive jurisdiction in all matters relating to the regulation of telecommunications companies in this state, see Florida Statutes Chapter 364, the Public Service Commission (“Commission”) ordered BELLSOUTH to make certain refunds to its customers “based on access lines, pro rata according to rate level.” In doing so, the Commission intended for BellSouth to credit local telephone charges to its customers on their June 1997, June 1998 and December 1998 bills. Since the customers were being credited for local telephone charges, BELLSOUTH likewise credited its customers for the public service taxes applicable to such charges. In essence, BellSouth collected and remitted public service taxes on the net amount of local telephone charges billed to customers in the respective months.
Defendants, however, have taken the position the public service taxes were due based on the amounts that would have been charged for local telephone service had the credits not been ordered by the Commission and made by Bell-South. Accordingly, in February of 1999, HAYNIE, as Comptroller, issued an assessment claiming that BELL-SOUTH owed ORANGE COUNTY $358,769.46 plus interest for unpaid public service taxes for June 1998. Then in July of 1999, she issued a similar assessment claiming that BELLSOUTH owed ORANGE COUNTY public service taxes in the amount of $122,598.00 for June 1997 and $88,674.00 for December 1998.
The court determines that the actions of HAYNIE and ORANGE COUNTY in making these assessment were contrary to Florida law. Florida’s Constitution provides that “[n]o tax can be levied except in pursuance of law.” Art. VII, § 1(a), Fla. Const. Thus, public service taxes are purely statutory in nature. Under a plain meaning construction of Florida Statutes § 166.231(9)(a)(2), once the credits were ordered by the Commission, public service tax was due only the net amount of local telephone charges billed to customers, after applying the credits ordered by the Commission. The court finds that BELL-SOUTH properly implemented the Commission orders and properly collected and paid public service taxes on the net amounts charged for local telephone service after applying such credits. Accordingly, it is ORDERED and ADJUDGED as follows:
1. The motion for summary judgment of plaintiff BELLSOUTH is hereby GRANTED.
*481 2. The motions for summary judgment of defendants ORANGE COUNTY and HAYNIE are hereby DENIED.
3. A final judgment consistent with this order will be entered forthwith.
The court subsequently entered a final declaratory judgment in favor of Bell-South, concluding that the determinations/assessments and notices of decision issued by the Comptroller on behalf of Orange County for unpaid public service taxes for June, 1997, June, 1998, and December, 1998, were void and unenforceable. The court also dismissed with prejudice the counterclaims filed by Orange County and the Comptroller.
The fundamental disagreement among the parties concerns the proper application of the over-earnings credit to BellSouth’s customers’ bills and the tax consequences that flow therefrom. To illustrate how the parties contend the refund credits should be applied along with the resulting tax consequences, assume that an Orange County customer pays $20 per month for basic telephone service and that the PSC over-earnings refund credit for this customer is $10.
Orange County contends the customer’s bill should be calculated as follows:
Monthly Access Line Charge $20.00
7% Public Service Tax $ 1.40
SUBTOTAL: $21.40
Refund Credit: ($10.00)
AMOUNT DUE $11.40
BellSouth argues the bill should be calculated as follows:
Monthly Access Line Charge $20.00
Refund Credit: ($10.00)
SUBTOTAL: $10.00
7% Public Service Tax $ .70
AMOUNT DUE $10.70
The actual bills sent by BellSouth reflected the refund credits as follows:
Monthly Access Line Charge $20.00
7% Public Service Tax $ 1.40
SUBTOTAL: $21.40
Refund Credit: ($10.00)
7% Public Service Tax Credit $ (.70)
NET AMOUNT DUE $10.70
The issue on appeal is whether the public service tax levied by Orange County should be applied to the gross (total) amount charged by BellSouth to its Orange County customers before applying the over-earnings refund credit, or on the net amount of the bill after applying the over-earnings refund credit. Because this issue presents a pure question of law, we review the matter de novo. See Armstrong v. Harris, 773 So.2d 7, 11 (Fla.2000). To properly analyze this issue, I believe it must be determined if the public service tax was already paid on the refunded earnings (in whole or in part) or not.
While the PSC has exclusive jurisdiction to regulate telecommunication companies, it has no jurisdiction regarding public service taxes, a position conceded by the PSC in its amicus memorandum filed in the trial court. Section 364.01 provides the PSC with broad regulatory powers regarding the telecommunications industry but also limits the PSC’s authority regarding public service taxes. Specifically, section 364.01(2) provides:
It is the legislative intent to give exclusive jurisdiction in all matters set forth in this chapter to the Florida Public Service Commission in regulating telecommunications companies, and such preemptions shall supersede any local or special act or municipal charter where any conflict of authority may exist. However the provisions of this chapter shall not affect the authority and powers granted in s. 166.231(9) [4]....
*482 (Emphasis added). Equally clear is the PSC’s exclusive authority to determine a reasonable rate of return for BellSouth and the method and basis for making refunds, when any such refunds are ordered.[5] §§ 364.035, 364.05, 364.051, Fla. Stat. (1999). When a “refund is not related to specific rate changes, such as a refund for overearnings,” (as is the case here) refunds are made based on access lines, pro-rata according to rate levels. See Fla. Admin.Code R. 25-4.114(3).[6] The PSC orders that required BellSouth to make over-earnings refunds did not (and could not, based on the limiting language in section 364.01(2)), address BellSouth’s treatment of the public service tax on the over-earnings refunded to BellSouth customers.
BellSouth does not dispute Orange County’s ability to impose a public service tax on telecommunications services; rather, BellSouth takes the position that it refunded taxes that had already been paid to its Orange County customers. As was shown previously, the customer bills Bell-South utilized actually showed a credit for the public service tax applicable to the over-earnings refund. Obviously, that presupposes that the tax had previously been paid. The record does not support that supposition. While BellSouth argues that the bills showed this credit simply because of the limitations of its billing system, that does not change the result. “To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies [in this country].” Comm’r of Internal Rev. v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945).
The public service tax applies to basic telecommunication services as defined by section 203.012, Florida Statutes (1999). Section 203.012(5)(a) defines telecommunications services, in relevant part, as local telephone service. The tax does not apply to other sources of BellSouth’s revenue such as equipment rental, service and installation charges, interest income, Internet access fees, some Yellow Page advertising, etc. See § 203.012(5)(b), Fla. Stat. (1999). The parties agree that some of the excess revenue refunded to BellSouth customers is attributable to revenue previously subject to the public service tax, while some other undetermined portion of the refund is attributable to excess earnings not subject to the tax, and therefore, not *483 previously taxed. The record contains no evidence demonstrating what portion, if any, of the excess earnings refunded is attributable to services already taxed, and what portion is attributable to services not previously taxed. BellSouth contends that the source of the over-earnings is irrelevant. I disagree. If the refunded over-earnings were already taxed, such sums cannot be taxed again. That would constitute double taxation. However, if the over-earnings were not previously taxed, then the tax should be applied to the total amount charged the customers as required by law.[7] To refund the taxes, as BellSouth has done, gives BellSouth’s customers a refund of taxes they may never have paid, on at least some portion of the refund credit. Before the customers can receive a credit or refund for those taxes, BellSouth, or its affected customers, have the burden of proving that the public service tax had already been paid on the refunded amounts or on some portion thereof. See generally State Ex Rel Liggett Drug Co. v. Gay, 158 Fla. 595, 29 So.2d 623 (1947); Ves Carpenter Contractors, Inc. v. City of Dania, 422 So.2d 342 (Fla. 4th DCA 1982). To do otherwise may refund taxes that had not been paid. In construing tax statutes, exceptions, exemptions and tax credits are strictly construed against the taxpayer. Dep’t of Rev. v. Kemper Investors Life Ins. Co., 660 So.2d 1124, 1127 (Fla. 1st DCA 1995). See State Ex Rel Szabo Food Serv., Inc. of N.C. v. Dickinson, 286 So.2d 529 (Fla.1973); Dep’t of Rev. v. Shop, 383 So.2d 678 (Fla. 5th DCA 1980). If the authority to tax is clear, as I believe it is here, the burden to show that tax has been paid on taxable transactions falls to the taxpayer, or in this case, BellSouth.
There are, however, other pillars that support Orange County’s position. It is axiomatic that the authority to tax is strictly construed against the taxing authority, and in favor of the taxpayer, and any ambiguities or doubts are to be strictly construed against the taxing authority and in favor of the taxpayer. Maas Bros. v. Dickinson, 195 So.2d 193 (Fla.1967); Warning Safety Lights of Georgia, Inc. v. State, Dep’t of Revenue, 678 So.2d 1377 (Fla. 4th DCA 1996). “This salutary principle is found in the reason that the duty to pay taxes, while necessary to the business of the sovereign, is still a duty of pure statutory creation and taxes may be collected only within the clear definite boundaries recited by statute.” Maas Bros., 195 So.2d at 198. In construing tax statutes, the primary consideration is to ascertain and give effect to legislative intent, determined primarily from the language of the statute. Miele v. Prudential-Bache Secs., 656 So.2d 470 (Fla.1995). “A court’s function is to interpret statutes as they are written and give effect to each word in the statute.” Fla. Dep’t of Rev. v. Fla. Mun. Power Agency, 789 So.2d 320, 324 (Fla.2001). Accordingly, “[w]hen the language of a statute is clear and unambiguous, the statute must be given its plain and ordinary meaning.” Metro. Dade County v. Milton, 707 So.2d 913 (Fla. 3d DCA 1998) (quoting Comerica Bank & Trust, F.S.B. v. SDI Operating Partners, L.P., 673 So.2d 163, 167 (Fla. 4th DCA 1996)). “Words of common usage, when employed in a statute, should be construed in their plain and ordinary sense.” Zuckerman v. Alter, 615 So.2d 661, 663 (Fla.1993).
Section 166.231(9)(a)2., Florida Statutes (1999) provides in relevant part:
*484 (9) A municipality may levy a tax on the purchase of telecommunication services as defined in s. 203.012 as follows:
[[Image here]]
2. Only upon purchases within the municipality of telecommunications service that originates and terminates in this state at a rate not to exceed 7 percent of the total amount charged for any telecommunications service provided within the municipality or, if the location of the telecommunications service provided cannot be determined as part of the billing process, the total amount billed for such telecommunications service to a telephone or telephone number, a telecommunications number or device, a service address, or a customers’ billing address located within the municipality....
(Emphasis added). The statute clearly imposes the public service tax on the “total amount charged” for telecommunications services. See § 166.281(9)(a)2., Fla. Stat. (1999) (emphasis added). We assume that the Legislature knew the plain and ordinary meaning of the words “total” and “charged” when it included these terms in the statute. Hankey v. Yarian, 755 So.2d 93, 96 (Fla.2000). See Aetna Cas. & Surety Co. v. Huntington Nat’l Bank, 609 So.2d 1315, 1317 (Fla.1992). Reference to a dictionary is permissible, if necessary, to determine such meaning. See L.B. v. State, 700 So.2d 370, 372 (Fla.1997); Green v. State, 604 So.2d 471, 473 (Fla.1992). The dictionary defines the term “total” as “[a] whole quantity; entirety” and “[constituting or pertaining to the whole; entire.” The American Heritage College Dictionary 1280 (2d ed.1985). Further, the dictionary defines the term “charged” as “[t]o set or ask (a given amount) as a price” or “[t]o hold financially liable; demand payment from.” The American Heritage College Dictionary 259 (2d ed.1985). Applying the plain and ordinary meaning of the terms “total” and “charged,” I believe that the statute requires the tax to apply to the gross amount (the total amount charged) billed for telecommunication services, and not the net amount as argued by BellSouth. Cf. § 212.02(16), Fla. Stat. (1999) (providing that sales price means the total amount paid for tangible personal property, including any services that are a part of the sale and any amount for which credit is given to the purchaser by the seller, without any deduction).
The total amount charged by BellSouth to its customers in the relevant months remained unchanged. The only change was in the net amount due because of the application of the over-earnings refund credit. These refunds were not made as a result of an overall rate reduction; rather, the refunds were made due to BellSouth’s excess earnings.
Based on the foregoing, I would conclude that the total amount charged for the telecommunications service, and consequently the amount subject to the public service tax, is the gross amount charged and not the net amount due after credits and/or refunds are applied, in the absence of proof that the tax had previously been paid on all, or some portion, of the credited or refunded amount.
Accordingly, I would reverse the judgment of the trial court and direct that judgment be entered in favor of Orange County and Haynie.

. As a charter county, Orange County has the authority to enact and enforce any tax that a municipality may impose, including the public service tax. McLeod v. Orange County, 645 So.2d 411, 413 (Fla.1994).

. The 1999 version of section 166.231(9) is applicable to the instant case. Section 166.231(9) has since been repealed and replaced with the Communications Services Tax Simplification Law, codified in Chapter 202, Florida Statutes. The new law took effect October 1, 2001. See §§ 202.10-.41, Fla. Stat. (2002).

. In its Amicus Curiae Memorandum of Law, filed with the trial court, the PSC explained that the customer's share of the refund was based on the amount of local service that the customer used. The PSC explained:
An access line is the phone line to the customer. Most residential customers have one access line. The state is divided geographically into rate groups, based on the total number of access lines in a geographical area. Each rate group has a specific rate level, which is the basic charge for local service in that rate group. Thus the cost for local service varies throughout the state.

. Section 166.231(9), Florida Statutes (1999) authorizes local governments to levy the pub-lie service tax.

. Rule 25-114(5), Florida Administrative Code provides the following:
(5) Method of Refund Distribution. For those customers still on the system, a credit shall be made on the bill. In the event the refund is for a greater amount than the bill, the remainder of the credit shall be carried forward until the refund is completed. If the customer so requests, a check for any negative balance must be sent to the customer within ten (10) days of the request. For customers entitled to a refund but no longer on the system, the company shall mail a refund check to the last known billing address except that no refund for less that $1.00 will be made to these customers.

. Rule 25-4.114(3) of the Florida Administrative Code provides:
(3) Basis of Refund. Where the refund is the result of a specific rate change, including interim rate increases, and the refund can be computed on a per customer basis, that will be the basis of the refund. However, where the refund is not related to specific rate changes, such as a refund for overeamings, the refund shall be made to customers of record as of a date specified by the Commission. In such case, refunds shall be made on the basis of access lines. Per customer refund refers to a refund to every customer receiving service during the refund period. Customer of record refund refers to a refund to every customer receiving service as of a date specified by the Commission.
(Emphasis added).

. For example, if BellSouth proved that half of the refunded over-earnings came from previously taxed transactions and half did not, Orange County’s assessment would then be reduced by half (excluding interest and penalties).